# United States Court of Appeals
## For the First Circuit

No. 06-2472

UNITED STATES OF AMERICA,

Appellee,

v.

RASHAUN JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lynch, Circuit Judge.

Susan E. Taylor, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

April 11, 2008

**TORRUELLA**, **Circuit Judge**.  On June 23, 2006, a jury found Rashaun "Smoke" Jones guilty of conspiracy to distribute and possess with intent to distribute heroin and cocaine base.  Before trial the district court, on recommendation of the magistrate judge, denied Jones's motion to suppress certain evidence seized from his hotel suite.  Jones claims error in this denial.  On October 6, 2006, the sentencing court sentenced Jones to 188 months' imprisonment.  Jones argues that the sentencing court erred in calculating the drug quantity that went into his Guidelines sentence calculation, and in finding him eligible for a two-level upward adjustment to his base offense level for his role as an organizer or manager of other criminal actors.  Upon thorough examination of the record and the parties' arguments, we affirm Jones's conviction and sentence.

## I.  Background[1]

On December 29, 2005, Sgt. John O'Malley of the Scarborough, Maine, Police Department learned from the manager of the TownePlace Suites hotel that an individual named Rashaun Jones had checked into Room 318; Room 318 was a suite with two bedrooms, a living room, a kitchenette, and a bathroom.  After running a

---

[1]  "We recite the facts relating to [Jones's] motion to suppress as found by the district court, consistent with record support." United States v. Brown, 510 F.3d 57, 61 n.1 (1st Cir. 2007); see also United States v. Jones, No. 05-84-P-S, 2006 WL 763124 (D. Me. Mar. 24, 2006) (magistrate judge's recommended factual findings); United States v. Jones, No. 05-84-P-S, 2006 WL 1071893 (D. Me. Apr. 21, 2006) (adopting magistrate judge's recommendation).

database check on Jones, Sgt. O'Malley discovered that there was a warrant out for his arrest on drug charges, and that the U.S. Marshals Service ("USMS") was responsible for the warrant. The database indicated that Jones should be considered armed and dangerous.

Sgt. O'Malley contacted the USMS, which informed him that an arrest team would be assembled. O'Malley also contacted Drug Enforcement Administration ("DEA") task-force agents Steven Thibodeau and Paul Wolf. Agent Wolf had been part of the investigation that led to Jones's arrest warrant, and he asked Sgt. O'Malley to meet him at the hotel. Wolf and O'Malley obtained passkeys to Rooms 317 and 318. Sgt. O'Malley positioned himself in Room 317, while Wolf waited in his car in a nearby parking lot for the team of U.S. Marshals and DEA agents to arrive. Sgt. O'Malley had a view of Room 318's door through the peephole in the door of Room 317.

At a certain point, Sgt. O'Malley observed a man and a woman leave Room 318 and drive away in a car. Sgt. O'Malley radioed Agent Wolf, who followed the car and observed it circle around a parking lot, without stopping, before returning to the hotel. Sgt. O'Malley saw the man emerge from the car and reenter Room 318; shortly thereafter, he heard an exuberant male voice through the wall, counting from one to eight. Agent Wolf and Sgt.

O'Malley concluded that a drug transaction had likely taken place during the short car ride.

Agent Wolf then joined Sgt. O'Malley in Room 317. Sgt. O'Malley again observed a man and woman exit the room and drive away in a car. Officers stopped the car in a nearby parking lot and questioned its occupants. The man said he had been sent on a short trip to the supermarket to buy cigarettes; he admitted that Jones was indeed one of the persons in Room 318, and that Jones and the other occupants were waiting for him to return. The man's cell phone began to ring and rang every few minutes thereafter; the officers did not allow the man to answer the cell phone.

In the meantime, several officers had assembled in a parking lot adjacent to the hotel. This group of officers included, among others, task-force agents Gregory Boucher, Stephen Welsh, and Greg Bunch, and Chief Deputy U.S. Marshal John Cooper. Concerned that the man's failure to answer his cell phone or return to the hotel promptly would raise Jones's suspicions, Agent Wolf and Marshal Cooper decided to enter Room 318. Using the passkey provided by the hotel manager, a six-member team opened Room 318's door without knocking, entered with weapons drawn, and shouted, "Police!" A number of additional officers followed closely behind.

The officers found four men inside and handcuffed them. Several of the officers also saw marijuana in plain view on a living room table, and smelled marijuana smoke in the air. Agent

Welsh detained and handcuffed a man sitting on the living room couch who identified himself as Jones. Jones was then placed into one of the bedrooms with Agents Boucher and Bunch. Boucher read Jones his Miranda rights from a standard DEA "rights card," pausing periodically to ask Jones if he understood. Jones responded in the affirmative. Jones did not appear nervous or intoxicated. Agent Boucher asked Jones if the officers could search the suite, but did not tell him he had the right to refuse consent; Jones responded that they could perform the search.

During this period, Marshal Cooper took one of the other individuals from the bathroom, where he had been temporarily detained on the floor, to the kitchenette. Marshal Cooper testified that, before placing the detainee in the kitchenette, he conducted what he termed a "security sweep" to make sure there were no weapons within the detainee's reach. While looking inside a kitchen cabinet, Marshal Cooper discovered a rice box without a lid. He looked inside and saw what appeared to be packages containing drugs of some kind. Marshal Cooper also saw pills in a baggie on a shelf in the cabinet, but did not seize these or the drugs in the rice box. Marshal Cooper then decided it would not be a good idea to leave the detainee there, and instead seated him on the closed toilet lid in the bathroom. Sometime later, Agent Welsh, who had left Room 318 briefly and taken one of the other detainees into Room 317 for questioning, returned to Room 318 and

conducted a search of the kitchenette. Agent Welsh found and seized the rice box and the baggie; the baggie contained ecstacy and the rice box contained heroin.

A grand jury indicted Jones on one count of conspiracy to distribute and possess with intent to distribute one kilogram or more of a mixture or substance containing heroin, and a mixture or substance containing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Jones moved to suppress the fruits of the search of Room 318, claiming it was illegal because the officers entered the room without knocking and announcing their presence, because any consent to search given by him was not knowing and voluntary, and because Marshal Cooper's search of the kitchen cabinet was not incident to a lawful arrest or part of a protective sweep. After a hearing at which several of the officers testified, the magistrate judge issued a recommendation that the motion to suppress be denied. He reasoned that (1) exigent circumstances justified the no-knock entry into Room 318; (2) Jones freely and voluntarily consented to the search of Room 318; and (3) Marshal Cooper's discovery of the heroin and ecstacy occurred after Jones had given his consent, and was lawful in any event as part of a protective sweep. Over Jones's objection, the district court adopted the recommendation. Jones again objected at trial when the items seized from Room 318 were introduced into evidence.

At trial, the Government called a number of witnesses. According to the testimony presented, Jones would acquire heroin, cocaine, and cocaine base (a.k.a. "crack") from a supplier in New York. Evidence was also presented showing that Jones coordinated the distribution of these drugs to consumers in southern Maine through a number of sellers, including most importantly Nick Foster and John Thomas. On June 23, 2006, the jury convicted Jones as charged in the indictment.

In the Presentence Report ("PSR"), the probation officer calculated Jones's Guidelines Sentencing Range ("GSR") to be 188 to 235 months. The PSR took into account the quantum of different drugs seized during the search of Room 318 and from Jones's coconspirators and customers, and that which coconspirators admitted to having distributed on behalf of the conspiracy. Ultimately, the PSR attributed to Jones 3,658 grams of heroin, 25.8 grams of crack cocaine, and 0.8 grams of powder cocaine, for a total of 4,174.16 kilograms of marijuana equivalent. This put Jones's base offense level at thirty-four. See U.S.S.G. § 2D1.1 (c)(3). The PSR also determined that Jones had supervised two of the coconspirators -- Foster and Thomas -- and accordingly recommended a two-level upward adjustment. See id. § 3B1.1(c). Over Jones's objection, the sentencing court adopted the PSR's

recommendations.[2]   After explaining its reasoning, the court sentenced Jones at the bottom of the applicable Guidelines range to 188 months' imprisonment.  Jones appealed.

## II.  Discussion

### A.  The Motion to Suppress

Jones argues that the district court should have suppressed the fruits of the search of Room 318, raising the same three challenges he raised before the magistrate judge.  After noting the standard of review, we address these challenges in turn.

### 1.  Standard of Review

When considering challenges to a district court's denial of a motion to suppress, we ordinarily review findings of fact for clear error and conclusions of law de novo.  United States v. Meada, 408 F.3d 14, 20 (1st Cir. 2005).  Under clear error review, "we may reverse only if the record, read as a whole, gives rise to a 'strong, unyielding belief that a mistake has been made.'"  C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993)).

### 2.  The No-Knock Entry

Renters of hotel rooms generally benefit from the same Fourth Amendment right to be free from unreasonable searches and

---

[2]   The sentencing judge was not the same as the judge presiding over pretrial and trial proceedings.

seizures as they would if they were at home.  See United States v. Rengifo, 858 F.2d 800, 805 (1st Cir. 1988) (citing Stoner v. California, 376 U.S. 483, 486-87 (1964)).[3]  While police acting pursuant to a warrant must ordinarily knock and announce their presence before entering a dwelling to which Fourth Amendment protections apply, see United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998), a "no-knock" entry will be deemed reasonable if the police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence."  United States v. Boulanger, 444 F.3d 76, 81 (1st Cir. 2006) (quoting Richards v. Wisconsin, 520 U.S. 385, 394 (1997)).

Importantly, however, the Supreme Court has recently clarified that even if the police violate the Fourth Amendment by failing to knock and announce their presence in circumstances in which a no-knock entry is unwarranted, such violation, standing alone, will not compel the exclusion of evidence seized as a result of their entry into the dwelling.  See Hudson v. Michigan, 547 U.S.

---

[3]  We assume, as did the district court, that Jones was entitled to the protections of the Fourth Amendment while in Room 318.  He had rented the suite, in his name, for a three-week stay.  Moreover, the mere fact that the hotel manager gave the officers a keycard to enter Room 318, thereby manifesting her consent for officers to enter the suite, did not divest Jones of his reasonable expectation of privacy.  See Stoner, 376 U.S. at 490.

586, 594 (2006). In the wake of Hudson, we have recognized the absence of an exclusionary rule for knock-and-announce violations, provided the police have a valid arrest warrant or some other valid grant of authority to enter the target's residence, and reason to believe the target is inside. See United States v. Pelletier, 469 F.3d 194, 199 (1st Cir. 2006) (also noting that, "[g]enerally speaking, this principle extends to the target's hotel or motel room").

The district court's decision denying Jones's motion to suppress, which predates both Hudson and Pelletier, addresses the merits of Jones's challenge to the no-knock entry, ultimately finding the entry justified because of the risk to the officers' safety and that drug evidence might be destroyed. In light of Hudson and Pelletier, we need not go so far. The remedy Jones seeks is the suppression of the fruits of the search of Room 318. He does not challenge the validity of the arrest warrant against him, nor the officers' professed belief that he was in Room 318 at the time. In any event, we find that such belief was objectively reasonable based on the following evidence credited by the district court: the hotel manager told officers that Jones had rented Room 318 for a three-week period, and the man detained in the parking lot told officers that Jones was then inside the suite. The arrest warrant and the reasonable belief Jones was inside Room 318 gave the officers the authority to enter. See id. (citing Payton v. New

York, 445 U.S. 573, 603 (1980)).  Even if they violated the Fourth Amendment by failing to knock and announce their presence before going in, the motion to suppress was not the appropriate vehicle for Jones to obtain the remedy he seeks.  See Hudson, 547 U.S. at 597-99 (suggesting other avenues of relief).  We thus proceed to Jones's next assignment of error.

### 3.  The Validity and Scope of Jones's Consent

It is axiomatic that officers must ordinarily procure a warrant before searching a locale to which Fourth Amendment protections apply.  See Groh v. Ramírez, 540 U.S. 551, 558-59 (2004).  Several exceptions to this requirement exist, however, one of which is valid consent to search by someone having authority to give consent.  See United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000).  In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily.  United States v. Marshall, 348 F.3d 281, 285-86 (1st Cir. 2003).  The assessment of whether consent is free and voluntary is a question of fact that requires an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party.  Pérez-Montañez, 202 F.3d at 438.  The district court's factual findings relating to the validity of the consent are reviewed for clear error.  See Marshall, 348 F.3d at 284.

Although the officers in this case had a valid warrant to arrest Jones, they did not have a warrant to search Room 318 when they decided to enter the suite. The district court found the search of Room 318 constitutionally permissible nonetheless, because Jones had given his consent freely and voluntarily. Agent Boucher testified that he advised Jones of his Miranda rights, and that Jones acknowledged that he understood them. See United States v. Kimball, 741 F.2d 471, 474 (1st Cir. 1984) (giving of Miranda rights a factor to consider in totality of circumstances). Agent Boucher also testified that Jones did not appear to be intoxicated, that he seemed to understand what was going on, and that neither Agent Boucher nor any other officer extracted Jones's consent through threats or promises.[4] See Pérez-Montañez, 202 F.3d at 438 (threats, intimidation, and coercion are factors to consider in an analysis of the totality of the circumstances). The district court found this testimony to be a credible account of what actually happened. We see no reason to disagree.

Jones argues, however, that three additional factors should lead us to overturn the district court's finding that his

---

[4] Agent Wolf, who took over the questioning after Agent Boucher, also testified that Jones was calm and did not seem to be under the influence of alcohol or drugs.

We give no weight to Jones's halfhearted intimation that he may have been under the influence of marijuana since the officers, upon entering Room 318, discovered evidence of marijuana having recently been smoked by at least one of the suite's several occupants. See United States v. Luciano, 329 F.3d 1, 8 (1st Cir. 2003).

consent was free and voluntary. First, he claims his consent could not have been free or voluntary because neither Agent Boucher nor any other officer advised him of his right not to cooperate. This argument is unavailing. We have repeatedly held that the failure to advise a defendant of his right to refuse consent does not automatically render such consent invalid. See id. at 438 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 234 (1973)); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993); see also United States v. Drayton, 536 U.S. 194, 206-07 (2002) (no presumption of invalidity where person consents without explicit notification of right to refuse). In the relatively calm environment of the bedroom in which Jones had been placed, Agent Boucher read Jones his Miranda rights, and Jones acknowledged that he understood each of them, agreed to cooperate, and was not apparently under the influence. The district court did not clearly err in finding that Jones appreciated the significance of giving consent despite the officers' failure to advise him of his right to withhold such consent.

Second, Jones contends that, while none of the officers applied overt coercion on him to induce his consent, the circumstances should be regarded as inherently coercive: some ten to fifteen government agents, guns drawn, entered his hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him. See Barnett, 989 F.2d at 555

(one factor to be considered in totality of circumstances is "whether permission to search was obtained by coercive means or under inherently coercive circumstances"). This argument also fails. As we have observed, "[a]lthough sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, 'custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search.'" Id. (citation omitted) (second and third alterations in original) (quoting United States v. Watson, 423 U.S. 411, 424 (1976)). Upon the officers' entry, Jones and his associates surrendered to them without a struggle and no shots were fired. Jones was then handcuffed and made to sit on the edge of a bed. There is no indication in the record that Jones was mistreated or placed in an uncomfortable position, or that Agent Boucher, Agent Bunch, or anyone else brandished a weapon, made threatening gestures, or spoke threatening words during the interrogation. Considering the several countervailing factors outlined above, we find that the circumstances here were not so inherently coercive as to render Jones's consent unknowing or involuntary, even when considered together with the officers' failure to advise Jones of his right to refuse consent.

Third, Jones claims that any valid consent he may have given was confined to the bedroom in which he had been placed, and did not extend to the kitchenette or the other rooms of the hotel

suite. A search justified by consent will be deemed reasonable as long as it does not exceed the scope of the consent given. See United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999). When determining the scope of consent, we apply a test of objective reasonableness: "'[W]hat would the typical reasonable person have understood by the exchange between the officer and the subject?'" United States v. Meléndez, 301 F.3d 27, 32 (1st Cir. 2002) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). This inquiry requires an examination of the "overall context," including "contemporaneous police statements and actions." Turner, 169 F.3d at 87. As in past cases, we state no view on whether the scope of a given instance of consent is reviewed de novo or merely for clear error, as in the circumstances of the present case we would affirm under either standard. See Marshall, 348 F.3d at 286 (citing Meléndez, 301 F.3d at 32 (noting the split in our sister circuits on this question)); Turner, 169 F.3d at 87 n.4 (same).

Agent Boucher testified that he asked Jones for consent to search the "motel room." Jones responded with a simple "yes." As noted above, Room 318 was actually a suite with two bedrooms, a kitchenette, a living room, and a bathroom. Although Agent Boucher did not specify which of these rooms he was seeking consent to search, Jones did not expressly confine his consent to the bedroom. The district court found that Agent Boucher had "made it reasonably clear that he sought consent to search the entire suite, not just

-15-

the bedroom." Jones, 2006 WL 763124, at *11 n.11. We agree. An objective observer of the transaction between Agent Boucher and Jones would have understood the term "motel room" to encompass the whole of Room 318, and not just the bedroom. This is especially true considering that the officers had already viewed marijuana on the living room table, in close proximity to the couch on which Jones was sitting when they entered, and smelled marijuana smoke in the air; it is reasonable to expect that Jones was aware that the officers noticed this evidence of recent drug use. In this context, a reasonable person in Jones's position would have regarded Agent Boucher as requesting consent to search the whole suite for additional drugs.

As such, the district court did not err in concluding that Jones's consent extended to the entire suite, and it was not unreasonable for Agent Boucher and the other officers to conduct a search of the other rooms for drugs, including the kitchen cabinet. Cf. Meléndez, 301 F.3d at 33 (dismantling and looking inside a speaker did not exceed the scope of consent to search a room, as "[t]he speaker was located in the area that [the consenting party] had allowed the officers to search, and was a place in which the officers could have reasonably suspected drugs to be hidden"). Having dismissed Jones's challenge to his consent to search, we turn to his third and final assignment of error with respect to the denial of his suppression motion.

-16-

### 4. Marshal Cooper's Search of the Kitchen Cabinet

Jones argues that Marshal Cooper's search of the kitchen cabinet, and consequent discovery of drugs therein, was not justified as a protective sweep or under any other exception to the warrant requirement. The district court examined the timeline as established through the testimony of the various officers at the suppression hearing, and found that the Government had established by a preponderance of the evidence that Marshal Cooper actually discovered the drugs in the kitchen cabinet after Jones had given his consent to Agent Boucher. We have reviewed the officers' testimony and conclude that this finding was not clearly erroneous.[5] We briefly explain.

Agent Welsh and Marshal Cooper each testified that when they entered Room 318, they saw marijuana in plain view on the living room table. Agent Welsh testified that he immediately detained and handcuffed Jones, who was sitting on the living room couch. Jones was promptly taken into the bedroom, where Agent Boucher began the process of questioning him; according to Agent Boucher, the point at which Jones gave his consent was some ten to fifteen minutes after the officers' initial entry into Room 318. Agent Boucher then left the room and "advised a couple of the

---

[5] With respect to the district court's analysis of the timing of the consent, we apply the usual standard of review for factual findings in a decision denying a motion to suppress -- that is, clear error review. See Marshall, 348 F.3d at 284.

agents that we in fact had consent from Mr. Jones to search the motel room."  Agent Wolf testified that he was one of those whom Agent Boucher informed.

According to Marshal Cooper, during this period the other officers detained Jones's associates and performed a quick scan of the suite to make sure there were no hidden persons.  Marshal Cooper took responsibility for one of the detainees and initially had him handcuffed and lying on the bathroom floor.  Marshal Cooper testified that, at this point, it occurred to him to announce to the other officers that he had seen marijuana on the living room table, in case they wanted to seek a search warrant.  Marshal Cooper continued:  "One of the officers told me at that point that it's okay, they already had consent."  Sometime soon thereafter, when Marshal Cooper was satisfied that the suite had been secured, he attempted to relocate the detainee to the kitchenette, where he searched the cabinet and found what he believed to be drugs.  The district court credited Marshal Cooper's testimony and found that the search occurred after Jones gave his consent.[6]

We see nothing in the record that would lead us to quarrel with this finding, much less to reach a "strong, unyielding

---

[6]  At a later point in Marshal Cooper's testimony, the Government asked again whether Marshal Cooper had learned of Jones's consent before attempting to relocate the detainee to the kitchenette. Marshal Cooper responded, "I'm not sure," but immediately clarified that "I would think it was after."  The district court obviously credited this clarification.  It did not clearly err in doing so.

-18-

belief that a mistake has been made," as is required under the applicable standard of review. C.G. ex rel. A.S., 513 F.3d at 284 (citation and internal quotation marks omitted). Because Marshal Cooper's search of the kitchen cabinet occurred after Jones gave consent and -- as affirmed above -- the scope of the consent extended to the kitchen cabinet, it was constitutionally valid. Given this conclusion, we need not state a view on the district court's alternative ruling that the search was lawful in any event by virtue of the "independent source" doctrine.

Finding no infirmity in the denial of Jones's suppression motion, we proceed to examine the challenges relating to his sentence.

### B. Sentencing

Jones raises two challenges to his sentence. First, he contends that the sentencing court erred in its calculation of the quantity of drugs attributable to him, which accounted for a base offense level of thirty-four. See U.S.S.G. § 2D1.1(c)(3). Second, he argues that the sentencing court erred in applying a further two-level upward adjustment to his base offense level for his role as an organizer, leader, manager, or supervisor of other participants in the drug-selling enterprise. See id. § 3B1.1(c). We again note the applicable standard of review, and then consider these two challenges seriatim.

### 1.  Standard of Review

A sentencing court's findings of fact -- including its calculation of drug quantity -- are reviewed for clear error; questions of law involved in sentencing determinations are reviewed de novo.  United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007); United States v. Laboy, 351 F.3d 578, 582, 585 (1st Cir. 2003).  "A question about whether the evidence is sufficient to support a particular guideline determination is a question of law and, therefore, engenders de novo review."  Ramos-Paulino, 488 F.3d at 463.

### 2.  The Drug-Quantity Calculation

In determining drug quantity for purposes of calculating a defendant's base offense level under the Guidelines, the sentencing court may attribute to the defendant "all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook."  U.S.S.G. § 1B1.3 cmt. n.2(ii).  "Thus, a drug dealer who engages in criminal activity with others to further their collective interests may be held liable for the quantities of drugs sold by his partners, if those sales were a reasonably foreseeable consequence of the jointly undertaken actions."  Laboy, 351 F.3d at 582.  If the quantity of drugs actually seized does not reflect the full scale of the offense, the sentencing court may make a reasonable estimate of the total quantity involved.  See id. at 584 (citing U.S.S.G.

§ 2D1.1 cmt. n.12).  The Government must prove drug quantity by a preponderance of the evidence.  Id. at 582.  We will uphold the sentencing court's estimate as long as it is reasoned and finds support in the record.  See id. at 583-84.

In adopting the PSR's recommendation, the sentencing court found Jones responsible for 4,174.16 kilograms of marijuana equivalent.[7]  This figure included 0.8 grams of powder cocaine (0.16 kilograms of marijuana equivalent) seized from Room 318, and 25.8 grams of crack cocaine (516 kilograms of marijuana equivalent) estimated from what coconspirator Thomas told federal agents he had introduced into the southern Maine market as part of the conspiracy.[8]

The PSR estimated the remaining amount as 3,658 grams of heroin (3,658 kilograms of marijuana equivalent).  This quantity

---

[7]  As there are different controlled substances involved, the probation office converted each of the drugs into its "marijuana equivalent," added the quantities, and looked up the total in the drug quantity table in U.S.S.G. § 2D1.1(c).  See U.S.S.G. § 2D1.1 cmt. n.10(B).

[8]  Thomas told agents that, on at least three occasions, he went to New Jersey and brought back "hundreds" of vials of crack cocaine to Maine.  The PSR estimated conservatively that Thomas had made three trips and brought back 100 vials per trip, at an average of 0.086 grams of crack cocaine per vial, for a total of 25.8 grams.

For unknown reasons, the PSR did not recommend that Jones's sentence reflect other drugs it determined had been seized from Foster, Thomas, customers including a confidential informant, and from Room 318, as well as a quantity of heroin a customer named William Zinn admitted to having purchased from Jones.  These amounted to 2.909 additional grams of crack cocaine and 15.512 grams of heroin.

-21-

was based mainly on the trial testimony of Foster that he received heroin from Jones and Thomas and distributed twenty bricks of heroin per week for twelve weeks from April to June 2005, and sixty bricks per week for twelve additional weeks from July to September 2005, until Foster was arrested. A brick of heroin consists of fifty bags at 0.059 grams each, for a total of 2,832 grams distributed by Foster. The PSR then determined that Jones continued in the conspiracy after the arrests of Foster and Thomas on September 19, 2005, until Jones's own arrest at the TownePlace Suites fourteen weeks later on December 29, 2005. The PSR continued:

> However, as there is no evidence of the quantities distributed during this time frame and the impact . . . the arrest of [Jones's] co-defendant's [sic] had on his ability to continue to distribute large amounts (60 bricks a week), the Probation Office has used the conservative amount of 20 bricks a week.

Twenty bricks per week for the fourteen weeks from September 19, 2005, to December 29, 2005, produced a total of 826 grams. Added to the estimate of the amount Foster distributed for the conspiracy, the total came to 3,658 grams of heroin, or 3,658 kilograms of marijuana equivalent.

This amount added to the 516.16 kilograms of marijuana equivalent in crack and powder cocaine produced a grand total of 4,174.16 kilograms of marijuana equivalent. The sentencing court found the facts presented in the PSR to be credible, and opined

-22-

that "in all likelihood the amounts were probably greater than that set forth in the [PSR] and I find those quantities."  In other words, the sentencing court found Jones responsible for 4,174.16 kilograms.

In challenging this finding, Jones argues that the real weight attributable to him should be 2,176.20 kilograms of marijuana equivalent; he explained how he reached this figure in his brief and again at oral argument.  Jones also alleges that the 826 grams the PSR attributed to him for September to December 2005 is "pure speculation."  Jones's estimated quantity -- 2,176.20 kilograms -- would result in a base offense level of thirty-two. U.S.S.G. § 2D1.1(c)(4).

Yet even if we assume that Jones has provided us and the sentencing court with a plausible estimate of the drug quantity attributable to him, he cannot prevail.  This is because we find the PSR's estimate also to be generally plausible and that it enjoys a preponderance of record support primarily in the trial testimony of Foster.  The sentencing court was therefore within its discretion when it chose the PSR's estimate over Jones's estimate. See United States v. Marks, 365 F.3d 101, 105 (1st Cir. 2004).

We say "generally" plausible because we do agree with Jones in one respect.  We are dissatisfied with the PSR's poorly reasoned conclusion that Jones was responsible for 826 grams of heroin (826 kilograms of marijuana equivalent) distributed between

September and December 2005, a finding for which the PSR conceded "there is no evidence" but that the sentencing court nonetheless adopted. Yet we need not decide whether such adoption was clearly erroneous, because any error that may have occurred was harmless. The threshold quantity that triggers a base offense level of thirty-four -- that which Jones received -- is 3,000 kilograms of marijuana equivalent. U.S.S.G. § 2D1.1(c)(3). Even if we subtracted 826 from 4,174.16, the total found by the sentencing court, we would still be left with 3,321.16 kilograms, and Jones would receive the same base offense level. Cf. United States v. Hernández, 218 F.3d 58, 71 (1st Cir. 2000) (finding determination of drug quantity harmless, even if erroneous, as it did not affect defendant's sentence). We move on to Jones's final assignment of error.

### 3. The § 3B1.1(c) Two-Level Increase

The Guidelines provide for an upward adjustment to a defendant's base offense level due to the relative importance of his role in the offense. United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997) (en banc) (citing U.S.S.G. § 3B1.1(c)). To qualify for a § 3B1.1(c) upward adjustment, the evidence must show that the defendant "exercised control over, organized, or was otherwise responsible for superintending the activities of" at least one other participant in a criminal activity on at least one occasion. United States v. García-Morales, 382 F.3d 12, 19 (1st Cir. 2004)

-24-

(quoting Cruz, 120 F.3d at 3); accord United States v. Voccola, 99 F.3d 37, 44 (1st Cir. 1996) (single directed transaction is enough). While this showing is not a particularly onerous one to make, it is not enough that the defendant merely controlled, organized, or managed criminal activities, but must instead control, organize, or manage criminal actors. Ramos-Paulino, 488 F.3d at 464.

After hearing the parties' arguments, the sentencing court found that the Government had satisfied the requirements of § 3B1.1(c) by a preponderance of the evidence:

> I've taken into account the evidence in this case including the nature of this offense, the fact that [Jones] was directing his runners, the fact that I believe he was given a greater share of the monies involved in this conspiracy, the fact that he was the key planner and organizer of the conspiracy, the others were basically runners for him, and his degree of control and authority and I think the two level enhancement is modest in this case based on my understanding of the evidence . . . .

Jones takes issue with this determination. He argues that, while he supplied his alleged accomplices with drugs to sell, there was no evidence presented at trial to show that he recruited any of them, that he collected a disproportionate share of the proceeds of the drug-selling venture, or that he exercised any control or authority over the accomplices' activities. Instead, a drug supplier in New York oversaw the venture.

This argument is unavailing. There is an abundance of evidence in the record -- including in the trial testimony of Foster and several federal agents -- to support the sentencing court's finding that Jones coordinated the actions of a number of drug sellers including, most importantly, Thomas and Foster. Jones essentially controlled the supply of the drugs to these persons, and determined to a considerable extent when and where they would make deliveries. This is more than sufficient to satisfy the Government's modest burden under § 3B1.1(c). In spite of Jones's assertions to the contrary, § 3B1.1(c) does not require a showing that he recruited accomplices or received a disproportionate share of the proceeds. The sentencing court therefore committed no error in finding Jones to be an organizer, leader, manager, or supervisor of at least one other criminal actor, and the two-level enhancement was justified. Jones's sentence stands.

### III. **Conclusion**

For these reasons, we affirm Jones's conviction and sentence.

**Affirmed**.