# United States Court of Appeals
## For the First Circuit

No. 10-2146

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN GARCIA-HERNANDEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]
[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Howard, Ripple[*] and Selya,
Circuit Judges.

Michael J. Iacopino, with whom Brennan Caron Lenehan & Iacopino was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

October 12, 2011

[*]Of the Seventh Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. This appeal presents two unrelated issues, which we decide together only because they arise within the confines of a single criminal case. The first issue hinges on whether the Supreme Court's decision in Hudson v. Michigan, 547 U.S. 586 (2006), establishes categorically that exclusion of seized evidence is not available as a remedy for violations of the knock-and-announce rule. The second issue involves sentencing; its resolution depends on whether the aggravating role adjustment contained in section 3B1.1(b) of the federal sentencing guidelines authorizes a three-level upward enhancement when the defendant, although a manager or supervisor in a criminal activity comprising five or more participants, oversees fewer than five persons. After answering both of these inquiries in the affirmative, we affirm the judgment below.

## I. BACKGROUND

In February of 2009, a confidential informant furnished information to law enforcement officers in Manchester, New Hampshire, that led to the unmasking of a massive drug-trafficking operation. The enterprise had long tentacles, reaching out to a myriad of suppliers, couriers, wholesalers, and street-level dealers.

An intensive investigation ensued. In due course, task force agents apprehended Renaury Ramirez-Garcia (Ramirez) while he was endeavoring to purchase ten kilograms of cocaine from an

undercover officer. Ramirez admitted that he and defendant-appellant Juan Garcia-Hernandez were partners in what amounted to a franchise of the larger drug-trafficking ring. According to Ramirez, the defendant's principal responsibilities were the procurement of cocaine from sources higher up the chain of command and the transportation of the acquired contraband to New Hampshire.[1] From that point forward, Ramirez oversaw the distribution of the drugs in the Northeast.

After Ramirez told the agents that the local franchise was expecting a fifty-kilogram cocaine delivery in mid-April, they enlisted Ramirez's paramour, Nicole Kalantzis, to assist in the probe. In the course of meetings and telephone calls with Kalantzis, the defendant indicated that he expected the delivery of cocaine to occur on April 12. He also stated that Kalantzis could get a portion of the shipment to sell to Ramirez's customers. To that end, the defendant and his girlfriend gave Kalantzis specific instructions on how to manage distribution of the drugs in Ramirez's absence.

Armed with this intelligence, the agents obtained a warrant to search the defendant's residence. They planned to execute the warrant on April 12. On that morning — Easter Sunday — the officers sent Kalantzis into the house to confirm that the

---

[1] The sources of supply were located as far away as Mexico, Florida, and Texas.

shipment had arrived. When Kalantzis left the house with a suitcase containing 15 kilograms of cocaine, the agents executed the search warrant.

The manner in which the authorities executed the warrant is, for present purposes, of particular pertinence. One officer drove an armored vehicle onto the lawn and parked in front of a picture window. Another breached the front door with a battering ram. Others detonated noise-flash devices, causing windows in the residence to shatter. The main body of searchers, several carrying assault rifles, stormed into the residence.

All in all, 18 officers and a dog participated in the mission. Inside the home, they found eight adults (including the defendant) and three children. The search yielded drug paraphernalia, multiple cell phones, small quantities of cocaine and marijuana, and approximately $58,000 in cash.

The defendant's Cadillac was parked outside the residence. The police obtained an additional search warrant for it. That ancillary search recovered 30 kilograms of cocaine stowed in garbage bags in the vehicle's trunk.

The defendant was arrested and eventually charged with distribution of, and conspiracy to distribute, in excess of five kilograms of cocaine. See 21 U.S.C. §§ 841(a)(1), 846. He moved to suppress the seized evidence on the ground that the search party had violated the knock-and-announce rule by failing to alert the

occupants prior to forcing entry into the dwelling.  He posited that the manner in which the officers executed the search warrant — in his words, a "military assault" — was so egregious as to demand exclusion of the fruits of the search.

The district court (McAuliffe, J.) denied the motion to suppress on alternative grounds: first, it concluded that the officers' failure to knock and announce their presence was not fatal because the execution of the warrant fell within an exception permitting a no-knock entry where notice of the imminent ingress presents a great risk of danger or a likelihood that evidence would be destroyed.  The court also concluded, citing Hudson, that suppression was not an available remedy for a violation of the knock-and-announce rule.

The defendant proceeded to enter a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving the right to appeal the denial of his motion to suppress.  The district court accepted this plea and ordered the preparation of a presentence investigation report.

At the disposition hearing, the district court (Barbadoro, J.) set the defendant's base offense level at 36, adjusted downward by three levels for acceptance of responsibility, see USSG §3E1.1(a)-(b), and adjusted upward by three levels for the defendant's role in the offense, see id. §3B1.1(b).  This last

adjustment was premised upon a determination that the defendant had acted as a manager or supervisor in an extensive criminal activity.

These and other findings yielded an advisory guideline sentencing range of 188 to 235 months. The court imposed a 200-month incarcerative sentence. This timely appeal followed.

## II. ANALYSIS

The defendant challenges both the denial of his motion to suppress and the court's deployment of the upward role-in-the-offense adjustment. We address these challenges separately.

### A. Suppression.

In reviewing a district court's denial of a motion to suppress, "we assess factual findings for clear error and evaluate legal rulings de novo." United States v. Fagan, 577 F.3d 10, 12 (1st Cir. 2009). This is a deferential standard of review: "when the district court chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to respect." United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011) (citation and internal quotation marks omitted).

The argument for suppression is anchored in a perceived violation of the knock-and-announce rule. That rule, developed at common law, is now codified in a federal statute. See 18 U.S.C. § 3109; see also Wilson v. Arkansas, 514 U.S. 927, 931-34 & n.3 (1995) (discussing the rule's common-law evolution). It "requires

law enforcement officers to knock and announce their presence and authority prior to effecting a non-consensual entry into a dwelling." United States v. Pelletier, 469 F.3d 194, 198 (1st Cir. 2006).

The rule, however, is not absolute. It is well established that, in certain circumstances, officers executing a search warrant may be justified in declining to knock and announce their presence. For instance, a failure will not violate the rule when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997).

The parties joust over whether the no-knock entry into the defendant's abode violated the rule. The defendant argues that officers had no reason to believe that he presented any danger, as was made manifest by the dispatch of the unarmed informant into the house. The government counters that a no-knock entry was justified by the exigencies of the situation. We need not sort out the parties' conflicting positions about whether the entry into the defendant's home transgressed the knock-and-announce rule. Assuming arguendo that it did, suppression is not an available remedy.

The key precedent is Hudson. There, the Supreme Court squarely addressed whether a violation of the knock-and-announce rule might justify the exclusion of evidence seized. Noting that exclusion of evidence "has always been [a] last resort, not [a] first impulse," 547 U.S. at 591, the Court held the exclusionary rule inapplicable to knock-and-announce violations, id. at 590-602.

In taking this position, the Court noted two independent requirements for applying the exclusionary rule and explained why a knock-and-announce violation could never meet those requirements.

To begin, the Court deemed but-for causation "a necessary . . . condition for suppression." Id. at 592. In other words, there must be a causal link between the constitutional violation alleged and the discovery of the evidence seized. In the Court's view, a violation of the knock-and-announce rule could never achieve this benchmark; whether the officers knocked or not, the evidence would inevitably be discovered during the subsequent (valid) search. Id.

The Hudson Court set out a second condition for applying the exclusionary rule: that the beneficial effects of exclusion outweigh its social costs. Id. at 594-95. In explaining why application of the exclusionary rule to knock-and-announce violations would be costly, the Court worried about a possible flurry of knock-and-announce litigation from prisoners seeking a "get-out-of-jail-free card," the potential for increased violence

against officers hesitant to enter unannounced for fear that gathered evidence would be suppressed, and the potential for the destruction of evidence by those inside the dwelling. Id. at 595. As against these substantial costs, the only benefit from exclusion would be the deterrence of police misconduct. Id. at 596. Because the costs of using the exclusionary rule to remedy knock-and-announce violations would so clearly outweigh any corresponding benefits, the Court found this second requirement unmet. Id. at 599.

We have applied Hudson to affirm the denial of motions to suppress in a pair of cases alleging knock-and-announce violations. See United States v. Jones, 523 F.3d 31, 36-37 (1st Cir. 2008); Pelletier, 469 F.3d at 198-201. The defendant contends that these cases, and Hudson itself, are distinguishable because of the Rambo-like manner of entry that the officers adopted here. This contention is unavailing.

To be sure, the circumstances of this case differ from Hudson, where officers knocked first, then waited "three to five seconds" before entering the defendant's home in an unremarkable manner. 547 U.S. at 588. Similarly, the circumstances differ from both Jones and Pelletier, in which officers merely used hotel passkeys to effect non-consensual entry into transient places of abode. See Jones, 523 F.3d at 34; Pelletier, 469 F.3d at 197. Here, by contrast, the entry was accomplished with an armored

-9-

vehicle, a large complement of officers, noise-flash accompaniment, and a formidable show of force. The defendant strives to persuade us that the Hudson analysis is perforce different in this case because police officers should be discouraged from employing such aggressive and violent tactics when executing domestic search warrants. There are two reasons why we find this argument unconvincing.

For one thing, the circumstances to which the defendant adverts do nothing to satisfy the requirement of but-for causation. Even if the officers had knocked, announced, and politely entered the defendant's dwelling, the incriminating evidence would have been found when they conducted the search. The exclusionary remedy is unavailable when, as in this case, there is no causal link between the constitutional violation alleged and the evidence discovered during the ensuing search. See Hudson, 547 U.S. at 592.

For another thing, we do not accept the defendant's claim that an aggressive manner of entry materially alters the decisional calculus employed in Hudson. The defendant insists that there are compelling reasons to discourage officers executing search warrants from engaging in "military assault" tactics and that those reasons outweigh the social costs incident to employing the exclusionary rule. But this is nothing more than an ipse dixit, and we fail to see how the level of force used tips the Hudson balance. After all, the Court recognized that the chief benefit of applying the

exclusionary rule to knock-and-announce violations would be its deterrent effect on police misconduct. See id. at 596. The Court nevertheless concluded that the social costs of imposing exclusion outweighed that benefit. Id. In cases alleging a failure to knock and announce, the Court reasoned, police misconduct could be effectively deterred through civil suits, thus negating the need to invoke the extreme remedy of exclusion. Id. at 596-99. That the officers in this case used shock-and-awe tactics does not undermine this reasoning.[2]

In an effort to change the trajectory of the debate, the defendant notes the Hudson Court's discussion of the important interests safeguarded by the knock-and-announce rule: "protection of human life and limb," "protection of property," and "protect[ion] . . . of privacy and dignity." Id. at 594. He speculates that the threat to those interests is greater in this case than in the mine-run of cases due to the overly aggressive manner of the officers' entry.

---

[2] The defendant relies in part on Justice Kennedy's concurrence to support a deviation from Hudson's categorical approach. Justice Kennedy noted that Hudson "d[id] not address any demonstrated pattern of knock-and-announce violations" and stated that evidence of such a pattern on the part of law enforcement might warrant application of the exclusionary remedy to deter that conduct in the future. Hudson, 547 U.S. at 604 (Kennedy, J., concurring). Here, however, the defendant has presented no evidence that the law enforcement agencies participating in the search engaged in a pattern of knock-and-announce violations. The defendant's reliance on Justice Kennedy's reasoning is, therefore, misplaced.

-11-

Whether or not this is so, it is beside the point. The knock-and-announce rule does not implicate the interest in "shielding . . . evidence from the government's eyes." Id. at 593. That interest is suspended (in limited scope) once a valid warrant has issued. Id. A defendant claiming harm to that interest (say, harm from a warrantless search) may be entitled to exclusion as a remedy. But where, as here, a defendant asserts injury from a no-knock entry antecedent to an otherwise valid search, the remedies afforded in civil suits can adequately redress the harm to the interests that are affected. See id. at 596-99.

Although this issue is new to this court, we do not write on a pristine page. Two other courts of appeals have indicated that a no-knock entry, even when accompanied by significant force, cannot justify the exclusion of evidence seized. See United States v. Ankeny, 502 F.3d 829, 833, 835-38 (9th Cir. 2007) (holding that defendant could not suppress evidence seized in an aggressive search that caused him physical injury and property damage); see also United States v. Watson, 558 F.3d 702, 704-05 (7th Cir. 2009) (holding, by analogy to knock-and-announce cases, that use of excessive force to search a car could not justify exclusion). We join these other courts in concluding that the holding in Hudson is categorical and that the amount of force used in effecting a no-knock entry does not alter that reality.

There is one loose end. At oral argument, the defendant shifted gears. Through able counsel, he averred that the overly aggressive manner of entry here may have violated the Fourth Amendment protection against police use of excessive force in the execution of a search warrant. See, e.g., United States v. Ramirez, 523 U.S. 65, 71 (1998). Putting aside any concerns about waiver or forfeiture, this argument fails on the merits.

It is common ground that courts can review a claim of excessive force to determine if the police acted unreasonably in carrying out a search and, thus, violated a defendant's Fourth Amendment rights. See United States v. Boulanger, 444 F.3d 76, 84 (1st Cir. 2006). But even if the police infringe the Fourth Amendment in this way, "the fruits of th[at] search are not subject to suppression." Ramirez, 523 U.S. at 71. It follows inexorably that whether the defendant characterizes the conduct of which he complains as a violation of the knock-and-announce rule simpliciter or as a violation of the knock-and-announce rule involving the use of excessive force, an exclusionary remedy remains beyond his reach.

## B. Sentencing.

The defendant challenges only one integer in the sentencing equation: the district court's use of a three-level aggravating role adjustment. In reviewing this challenge, we recognize that the district court is afforded considerable leeway

in making fact-specific sentencing determinations. <u>United States</u> v. <u>Martin</u>, 520 F.3d 87, 92 (1st Cir. 2008). Because a determination about an individual's role in a particular crime is inevitably factbound, we review such determinations deferentially. <u>United States</u> v. <u>Cruz</u>, 120 F.3d 1, 3 (1st Cir. 1997) (en banc). In the absence of an error of law, such determinations will be set aside only for clear error. <u>Id.</u>

The relevant sentencing guideline prescribes a three-level upward adjustment if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." USSG §3B1.1(b). An adjustment under this guideline requires two steps: first, the sentencing court must find that the underlying criminal activity involved more than five participants or was otherwise extensive; and second, the court must find that the defendant managed or supervised one or more of the other participants in that activity. <u>See</u> <u>United States</u> v. <u>Al-Rikabi</u>, 606 F.3d 11, 14 (1st Cir. 2010) (discussing related guideline provision).

Here, the defendant does not contest the lower court's determination that the conspiracy involved more than five participants or was otherwise extensive. Instead, he challenges the court's second-step determination that he managed five

participants overall and its subsidiary determination that he managed three particular participants.

We need not linger long over this narrowly focused challenge. The defendant does not deny that he managed at least one other participant in the criminal enterprise,[3] and even if he managed just one, section 3B1.1(b) would nevertheless apply to him.

The short of it is that the aggravating role adjustment described in section 3B1.1(b) requires only that a defendant manage one other participant in the covered criminal activity.[4] See USSG §3B1.1, comment. (n.2) ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."); see also United States v. Flores-De-Jesús, 569 F.3d 8, 34 (1st Cir. 2009) (stating that a defendant qualifies for an enhancement under USSG §3B1.1(b) if "he exercised authority or control over another participant" (citation and internal quotation marks omitted)). Consequently, the district court did not err in applying the three-level aggravating role adjustment in this case.

---

[3] The defendant has not challenged the district court's findings as to two of the five individuals that he was found to have managed.

[4] The policy reason behind this conclusion is sound. If a defendant occupies a high-level position in an extensive criminal activity, a stiffer punishment is warranted because of that defendant's position, not because of the number of underlings that he supervises.

**III. CONCLUSION**

We need go no further. For the reasons elucidated above, we affirm both the defendant's conviction and his sentence.

**Affirmed**.


— **Concurring Opinion Follows** —

**RIPPLE**, <u>Circuit Judge</u> **(Concurring).**  I join without reservation the clear and comprehensive opinion of the court. Unquestionably, after <u>Hudson</u>, the exclusionary rule is not an appropriate remedy for violations of the knock-and-announce rule. Nor is it an appropriate remedy if a court should determine that the manner in which a warrant was executed violated the reasonableness requirement[5] of the Fourth Amendment.  I write separately only to emphasize that the confluence of the rule we announce today and the prevailing methodological approach to the resolution of qualified immunity issues raises the significant possibility that conscientious law enforcement officers will be deprived of needed judicial guidance concerning the manner in which warrants must be executed.

Today's decision makes it clear that criminal trials, and appeals from those proceedings, rarely will yield judicial determinations about the reasonableness of the force employed in the execution of the warrant.  Such determinations therefore will occur most frequently in the adjudication of civil actions brought under 42 U.S.C. § 1983 or under <u>Bivens</u> v. <u>Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).  In most, although not all, the defense of qualified immunity will be available.  In such cases courts now are authorized to decide the qualified immunity issue without reaching the constitutional

---

[5] <u>See</u> <u>United States</u> v. <u>Ramirez</u>, 523 U.S. 65, 71 (1998).

-17-

question.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).  In Pearson, the Court made clear that the two-step sequence for resolving government officials' qualified immunity claims, previously formulated in Saucier v. Katz, 533 U.S. 194 (2001),[6] should not be regarded as an inflexible requirement.  Id.  It is now permissible for a court to determine that considerations such as judicial economy and the danger of premature constitutional adjudication counsel against resting its decision on constitutional grounds.  Id.  Instead, the court first may determine that, at the time they acted, the defendants' actions did not violate settled constitutional principles.

As the Court noted in Pearson, however, despite this new flexibility in approach, reaching the constitutional question "is often appropriate" and "often beneficial."  Id.  Indeed, the Court emphasized that "the Saucier Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable."  Id.; see also Jones v. Byrnes, 585 F.3d 971, 978-80 (6th Cir. 2009) (Martin, J.,

---

[6] Under Saucier v. Katz, 533 U.S. 194, 200 (2001), a court faced with a qualified immunity defense had to decide (1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct.

-18-

concurring).[7] Cases involving the manner in which a search warrant is executed certainly fall within this description. One might argue that the constitutionality of a particular search or seizure is "so factbound that the decision provides little guidance for future cases," Pearson, 555 U.S. at 237, and therefore it serves no useful purpose to address the constitutional issue. However, Fourth Amendment principles concerning reasonableness in the execution of a warrant, no less than the legal rules for probable cause and reasonable suspicion, "acquire content only through application." Ornelas v. United States, 517 U.S. 690, 697 (1996) (holding de novo review appropriate for determinations of probable cause and reasonable suspicion). This case-by-case adjudication will not, and need not, yield "'a highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts . . . [which is] literally impossible [to apply] by the officer in the field.'" New York v. Belton, 453 U.S. 454, 458 (1981), abrogated on other grounds by Arizona v. Gant, 556 U.S. 332 (2009), (quoting LaFave, "Case-By-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma, 1974 Sup. Ct. Rev. 127, 141 (1974)) (internal quotation marks omitted). It can develop, however, a body of law

---

[7] Pearson v. Callahan, 555 U.S. 223, 236 (2009), acknowledged that in such a situation--where the constitutional issue might escape resolution indefinitely--a court well might determine that the importance of providing needed constitutional guidance outweighs rigid adherence to the general counsel of avoiding, when possible, constitutional pronouncements.

to provide meaningful guidance that will benefit both law enforcement officers and civilians. Cf. Baird v. Renbarger, 576 F.3d 340, 344 (7th Cir. 2009) (electing to use the Saucier approach in an excessive force case).

By contrast, a judicial approach that, as a matter of course, does not reach the underlying constitutional issue will deprive conscientious officers of the guidance necessary to ensure that they execute their responsibilities in a manner compatible with the Constitution. Here, an incomplete constitutional landscape can present a practical problem of governance of significant proportions. "When a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." Belton, 453 U.S. at 459-60. "If . . . constitutional rights are to function as operational limits on government rather than mere figures of rhetoric, there must be an adequate structure of enforcement." John C. Jeffries, Reversing the Order of Battle in Constitutional Torts, 2009 Sup. Ct. Rev. 115, 117 (2009) (emphasis in original).